# EXHIBIT C

1
SAHELIAN LAW OFFICES
ARA SAHELIAN, Cal. Bar No. 169257
2
sahelianlaw@me.com
25108 Marguerite Parkway, Suite A
3
Mission Viejo, California 92692-2400
Telephone:    949.859.9200
4

5
Attorneys for Defendant,
SLAINTE BARS, LLC

6

7

8
                          UNITED STATES DISTRICT COURT

9
                         NORTHERN DISTRICT OF CALIFORNIA

10

11
BRIAN WHITAKER,                              Case No. 3:21-cv-03750-JSC

12
          Plaintiff,                         **DEFENDANT SLAINTE BARS, LLC'S**
                                             **SUPPLEMENTAL BRIEF AS TO**
13
v.                                           **PLAINTIFF BRIAN WHITAKER'S**
                                             **STANDING**
14
SLAINTE BARS, LLC, a California Limited
Liability Company; and DOES 1 through 10,    [*Request for Judicial Notice with Exhibits; and*
15                                           *Declaration of Ara Sahelian with Exhibits*
                                             *submitted concurrently herewith*]
          Defendants.
16
                                             Hon. Jacqueline Scott Corley
17                                           Complaint Filed: May 19, 2021
                                             Trial Date:  None Set
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  RELEVANT BACKGROUND ...............................................................................3

    A.   Plaintiff's Complaint As To His Standing ...................................................3

    B.   Plaintiff's Current Residence and Intent to Move to The Bay Area. ..........3

    C.   Plaintiff Admits His Trips to the Bay Area Are Motivated by ADA Litigation. ....................................................................................................6

    D.   Plaintiff's Motivation in Filing ADA Lawsuits is Purely Financial. .........6

    E.   Plaintiff Manufactures Article III Standing ................................................7

        1.   Plaintiff Never Revisited The Businesses He Sued. ........................7

        2.   Plaintiff Does Not Have and Has Never Had Plans to Revisit.........9

    F.   Plaintiff's Perjurious Statements About His Intent To Return....................12

III. ANALYSIS .............................................................................................................13

    A.   Standard for Article III Standing...............................................................13

        1.   Legal Standing Under The ADA....................................................13

    B.   Plaintiff Fails to Show an Injury-In-Fact or Imminent Threat of Future Harm. .........................................................................................................16

        1.   Plaintiff Has Not Gone Back To Any of the Businesses He Has Sued. ...............................................................................................16

        2.   Plaintiff and His Attorneys Concede He Never Had An Intent Or Plan to Return ................................................................................18

        3.   Plaintiff's Intent to Return Has Been Determined To Be Not Credible. .........................................................................................20

        4.   Plaintiff Now Intends to Move to Sacramento. .............................22

        5.   Plaintiff's Perjurious Testimony Destroys His Credibility. ..........23

        6.   Plaintiff Is Neither a Bona Fide Customer Nor A Tester. .............24

IV.  CONCLUSION ......................................................................................................25

1

2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

<u>Cases</u>

4

5

*Chapman v. Pier 1 Imports (U.S.) Inc.*
    631 F.3d 939 (9th Cir. 2011) (en banc) .......................................................... 13, 14

6

*City of Los Angeles v. Lyons*
    461 U.S. 95 (1983) ........................................................................................... 14

7

8

*Civil Rights Education and Enforcement Center ("CREEC") v. Hospitality Properties Trust*
    867 F.3d 1093 (9th Cir. 2017).................................................................. 14, 15, 16

9

*Fortyune v. Am. Multi-Cinema, Inc.*
    364 F.3d 1075 (9th Cir. 2004).......................................................................... 13

10

11

*Garcia v. Alcocer, et al.*
    Case No. 2:20-cv-08419-VAP-(JEMx) (filed September 15, 2020, Central Dist., CA)
    ...................................................................................................................... 20, 21

12

13

*Gastelum v. Hees II*
    2021 U.S. Dist. LEXIS 208436 (S.D. Cal. October 28, 2021)........................... 16

14

*Harris v. Del Taco, Inc.*
    396 F.Supp.2d 1107 (C.D. Cal. 2005).............................................................. 14

15

16

*Houston v. Marod Supermarkets, Inc.*
    733 F.3d 1323 (11th Cir. 2013)................................................................... 14, 15

17

18

*Johnson v. Alhambra & O Assocs.*
    2019 U.S. Dist. LEXIS 105388 (E.D. Cal. June 24, 2019)................................ 16

19

*Johnson v. JKLM Prop., L.L.C.*
    2020 U.S. Dist. LEXIS 167794 (N.D. Cal. Sept. 14, 2020)............................... 14

20

21

*Kirola v. City & Cty. of San Francisco*
    860 F.3d 1164 (9th Cir. 2017).......................................................................... 13

22

23

*Langer v. YM Holdings, LLC*
    2020 U.S. Dist. LEXIS 114073 (S.D. Cal. June 29, 2020) ............................... 16

24

*Lindsay v. Mulne*
    2019 U.S. Dist. LEXIS 239354 (C.D. Cal. Nov. 21, 2019) ............................... 16

25

26

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ............................................................................... 13, 14, 18

27

28

*Schmier v. U.S. Ct. App. for the Ninth Circuit*
    279 F.3d 817 (9th Cir. 2001) ................................................................. 13

*The Cetacean Community v. Bush et al.*
    386 F.3d 1169 (9th Cir. 2004) ............................................................... 13

*Whitaker v. BPP East Union LLC*
    2:20-cv-06818-MWF-E (C.D. Cal. Dec. 11, 2020) ............................... 21

*Whitaker V. Dollar Hits Temple Inc.*
    2021 U.S. Dist. Lexis 66854 (C.D. Cal. April 6, 2021) ........................ 22

*Whitaker v. The Goltz Corp.*
    2:21-cv-00527-JAM-CKD (E.D. CA, March 23, 2021) ............. 3, 12, 16, 19

*Whitaker v. Kajima Dev. Corp.*
    20STLC02281 (L.A. Super. Ct. Oct. 8, 2021) ...................................... 22

*Whitaker v. Kashani, et al.*
    2:18-cv-00346-JFW-PLA (C.D. Cal.) ..................................... 7, 12, 24

*Whitaker v. Los Angeles United Investment Co, LLC, et al.*
    21STLC01615 (L.A. Sup. Ct., Feb. 25, 2021 .......................................... 8

*Whitaker v. Mademoiselle Collette, Inc.*
    5:21-cv-03326-LHK ................................................................................ 3

*Whitaker v. Marso LLC*
    2021 U.S. Dist. LEXIS 178986 (N.D. Cal. Sept. 20, 2021) .................. 20

*Whitaker v. Marso LLC*
    Case No. 4:21-cv-03711-PJH (filed May 18, 2021) ............................. 19

*Whitaker v. MGR Properties, LLC*
    2:19-cv-05646-FMO-GJS (C.D. Cal. June 28, 2019) ............................. 8

*Whitaker v. Pachanga*
    20STLC03367 (L.A. Super. Ct. April 15, 2020) ..................... 8, 10, 22, 24

*Whitaker v. Pachanga Mexican Grill*
    Case No. 20STLC03367 (Ruling on Submitted Matter, December 6, 2021) .............. 3, 12, 22

*Whitaker v. Peet's Coffee, Inc.*
    3:21-CV-07055-WHA (N.D. Cal. Feb. 7, 2022) .................. 4, 5, 22, 23, 25

*Whitaker v. PQ Americana, Inc.*
    2020 U.S. Dist. LEXIS 71958 (C.D. Cal. Mar. 20, 2020) ..................... 22

*Whitaker v. Prime Oil Mgmt.*
    2021 U.S. Dist. LEXIS 192385 (C.D. Cal. April 8, 2021) ...................... 16

Case No. 3:21-cv-03750-JSC
DEFENDANT'S SUPPLEMENTAL BRIEF

*Whitaker v. Tormrock, LLC*
    Case No. 3:21-cv-09550-JD (N.D. Cal.) ............................................................................ 5, 23

<u>Statutes</u>

ADA ................................................................ 1, 2, 3, 6, 7, 12, 13, 14, 16, 17, 19, 20, 23, 24, 25

ADA, Tit. III................................................................................................................... 13, 14

<u>Other Authorities</u>

Rule 11 .............................................................................................................................. 1, 19

U.S. Const., Art. III ..................................................................... 2, 7, 13, 14, 16, 18, 20, 21

## I.  **INTRODUCTION**

The Center for Disability Access ("Potter Handy") has created a lucrative business model whereby it uses plaintiffs, just like Brian Whitaker ("Plaintiff"), to pervert the spirit and intent of the Americans with Disabilities Act ("ADA"). This enterprise is largely funded by extorting monetary settlements from small business owners across the State of California, many of them immigrant-owned, with threats of protracted and expensive litigation for fighting back. No one disputes that the principal which lays the foundation of the ADA – ensuring equal access – is a value shared by both Parties here. Yet, the evidence contained herein confirms that Potter Handy manufacturers its plaintiffs' standing. As shown here with Plaintiff Whitaker, Potter Handy manufactures its plaintiffs' intent to return to businesses using a web of perjurious and fraudulent declarations and oral testimony – all under penalty of perjury or Rule 11 – when none of these facts are true from the start and are instead, intricate inventions. The evidence leaves no doubt that in the approximately 1,733 cases filed by Plaintiff Whitaker, he lacked standing to pursue virtually all of them and that both he and his counsel were well aware of it. In fact, the evidence suggests a much larger scale conspiracy by Potter Handy, through its cadre of professional plaintiffs, like Plaintiff Whitaker, to commit fraud on the courts and which is motivated exclusively by money. Potter Handy has indeed mastered the commoditization of the practice of law with the intent only of benefitting itself and to the detriment of all those around it, including the small business communities and the courts which are bombarded with frivolous ADA cases on their dockets.

And while Plaintiff Whitaker would have the Court believe that his focus on the Northern District is because he intends to move to the Bay Area, the evidence belies his assertions. Rather, Plaintiff's change in venue is the direct result of the Central District's repeated determination, beginning in 2020, in both trials and in adjudicating dispositive motions, that Plaintiff lacked in both veracity and credibility. Indeed, these decisions halted Potter Handy's use of Plaintiff Whitaker as a litigant in the Central District since it ran contrary to its business model in that it became simply too expensive, too time consuming and too burdensome to file there. As of May 2021, Potter Handy stopped filing cases on behalf of Plaintiff Whitaker in the Central District

Case No. 3:21-cv-03750-JSC
DEFENDANT'S SUPPLEMENTAL BRIEF

altogether and its efforts on Plaintiff Whitaker's behalf are now centered in the Northern District, despite the fact that he lives approximately 350 miles away.

As Albert Einstein once said "logic will get you from A to B . . . [but] [i]magination will take you everywhere." And while Potter Handy repeatedly asks courts and defendants to operate in imagination and ignore the fact that Plaintiff does not have standing to sue under the ADA for injunctive relief, logic dictates that the only possible conclusion here, based on the evidence presented about Plaintiff's standing, is that Plaintiff's purported intent to revisit each of the 589 Bay Area establishments that he has sued is entirely impossible.  For one, this is because Plaintiff lives approximately 350 miles away and has given inconsistent testimony about why he comes to the Bay Area two to three times a month. And second, it is because Whitaker admits in sworn testimony that he never had a plan to return to any of the businesses that he has sued, and <u>still does not</u>.

A close review of the evidence unequivocally proves:

1) Plaintiff has traveled to the Bay Area not for the purpose of moving there as Potter Handy has **falsely** stated by way of sworn declarations submitted on his behalf over and over again, but because he makes his livelihood filing lawsuits and that is where Potter Handy tells him to go;

2) Plaintiff's complaints filed in federal courts across the State of California have contained **false** allegations of an intent to return and deterrence in an attempt to manufacturer fraudulent standing to pursue injunctive relief when none existed in the first place; and

3) Plaintiff's repeated **false** and inconsistent testimony has destroyed any credibility he might otherwise have had and therefore, any self-serving statements submitted in opposition to the instant brief should be disregarded by the Court.

As the law and evidence argued below unequivocally shows, Plaintiff lacks the ability to pursue this action (and, frankly, **all** others he has filed) because he lacks the requisite Article III standing to pursue injunctive relief.

## II.   RELEVANT BACKGROUND

### A.   Plaintiff's Complaint As To His Standing

In his Complaint, Plaintiff alleges a single violation of the ADA for Defendant's alleged lack of outdoor accessible dining tables. [Dkt. No. 1, ¶¶ 10, 12.] Defendant owns and operates a restaurant in Redwood City, the Alhambra Irish House ("the Irish House"). [*Id.*, ¶ 2.] Plaintiff alleges he visited the Irish House in May 2021 and "wanted to return and patronize the business again but was specifically deterred due to his actual personal knowledge of the barriers gleaned from his encounter with them." [*Id.*, ¶ 8.] Plaintiff contends he "will return to the Restaurant to avail himself of its goods or services and to determine compliance with the disability access laws once it is represented to him that the Restaurant and its facilities are accessible." [*Id.*, ¶ 20.]

### B.   Plaintiff's Current Residence and Intent to Move to The Bay Area.

Plaintiff currently lives in Los Angeles, California, which is a "lengthy" four and a half hour drive to the Bay Area. (*See* Declaration of Ara Sahelian ("Sahelian Decl."), ¶ 2, Exh. A, Evidentiary Hearing Transcript ("Evid. Tr."), Feb. 7, 2022 at 13:19-14:1.) Plaintiff's first Northern District case was filed on September 10, 2019. (*See* Request for Judicial Notice ("RJN"), Exh. 1, Whitaker Northern District Case List.) Since at least July of 2021, in response to various defendants' motions to dismiss in the Northern District which challenged Plaintiff's standing, Plaintiff testified that he intends to move to the Bay Area. (*See* RJN, Exh. 2, Whitaker Declaration in *Whitaker v. Mademoiselle Collette, Inc.*, 5:21-cv-03326-LHK, ("Collette Decl.") filed on May 4, 2021 at ¶¶ 3, 5) ("I travel all over Northern California to find a nice area to move to"; "I have visited the Palo Alto area at least three times recently, and I plan on returning in the near future to look for possible places to move to"; "For some time now, I have been coming to Northern California (Bay Area primarily) approximately twice a month for leisure and to look for areas to live.")

Interestingly, although Plaintiff has testified about his desire to move to the Bay Area, he has admitted that during these trips, he has not met with any real estate agents, visited any open homes, or viewed a any rental units. (*See* Sahelian Decl., ¶ 3, Exh. B, Whitaker Depo. Tr. in *Whitaker v. The Goltz Corp.*, 2:21-cv-00527-JAM-CKD **(**"Goltz Tr."), November 11, 2021 at 16:11-17:11; Sahelian Decl., ¶ 4, Exh. C, Trial Tr. in *Whitaker v. Pachanga Mexican Grill*,

1  20STLC03367 ("Pachanga Tr."), December 2, 2021 at 90:3-12; Sahelian Decl., ⁋ 2, Exh. A, Evid.

2  Tr. at 37:8-38:2; Sahelian Decl., ⁋ 5, Exh. D, Depo. Tr. in *Whitaker v. Peet's Coffee, Inc*., 3:21-

3  CV-07055-WHA (N.D. Cal.) ("Peet's Tr.") Feb. 7, 2022 at 62:19-64:16.

4       For example, Plaintiff's recent trip to the Bay Area, included a trip to Burlingame on

5  August 25, 2021. (Sahelian Decl., ⁋⁋ 5, Exh. D, Peet's Tr. at 15:3-10.) Even though Plaintiff

6  testified that he came to Burlingame on that day because he was "canvassing the area to look for

7  potential residency" (*Id*. at 15:8-10), he admitted that he met with no real estate agents, nor did he

8  look at a single dwelling unit during that visit. (*See id*. at 62:19-64:16) In fact, Plaintiff testified

9  that his August 25, 2021 trip was only for a few hours, where he flew into the San Jose airport (*see*

10 *id*. at 18:15) at around 10 a.m. (*see id*. at 22:6-11), rented a car and was driven to Burlingame (*see*

11 *id*. at 20:17-19), stayed in Burlingame for two to three hours (*see id*. at 22:12-16), then eventually

12 drove back to the San Jose airport and flew back to Los Angeles by 7 p.m. or 8 p.m. that same

13 evening (*see id*. at 22:9-11). Plaintiff testified that he was accompanied by his friend, Tyrus Payne,

14 and paid him $500 to serve as a security guard during the trip. (*See id*. 17:1-6; 26:15-17.) As a

15 result of this one-day trip to the Burlingame area on August 25, 2022, Plaintiff filed 14 lawsuits in

16 the Northern District against businesses that he purportedly encountered that day. (*See* RJN, Exh.

17 7, Peet's Supp. Record ISO Motion to Dismiss ("Peet's Supp. Record"), Feb. 9, 2022 at pp. 3-6.)

18      Although Plaintiff has been testifying since at least July 2021 that he intends to move to

19 the Bay Area (*see* RJN, Exh. 2, Collette Decl. at ⁋⁋ 3, 5), in October 2021, Plaintiff admitted that

20 he had recently moved into a new apartment in the Brentwood area of Los Angeles County, that he

21 had signed a one-year lease and that his current lease was not set to expire until October of 2022.

22 (*See* Sahelian Decl., ¶¶ 2, 5, Exhs. A, Evid. Tr. at 30:17-31:19; Exh D., Peet's Tr. at 11:11-12:20.)

23      On November 11, 2021, Plaintiff testified that he was "seriously considering" moving to

24 the Bay Area. (*See* Sahelian Decl., ⁋ 3, Exh. B, Goltz Tr. at 13:25-14:7; 16:4-10.) When asked,

25 "So you said you wanted to relocate up there. What steps have you taken to relocate?" (*id*. at 16:4-

26 5), Plaintiff stated, "Well, actually I said that I was seriously considering relocating there. And just

27 right now what I'm doing is just surveying the areas and seeing what I like and what I dislike and

28 how I feel about it out there." (*Id*. at 16:6-10.)

Case No. 3:21-cv-03750-JSC
DEFENDANT'S SUPPLEMENTAL BRIEF

On December 2, 2021, Plaintiff testified at trial in an accessibility case in Los Angeles Superior Court against a business in Manhattan Beach (Southern California) and, in response to the question, "you've also indicated that you intended to relocate to the Bay Area; correct?" (Sahelian Decl., ⁋ 3, Exh. C, Pachanga Tr. at 90:6-7), Plaintiff responded: "That I was looking into it, not that I intend to." (*Id*. at 90:8-9.)

Two months later, on February 7, 2022, at an evidentiary hearing held in this matter, Plaintiff testified that by October 2022, with "definity [sic] . . . by that time" he "will have relocated to the Bay Area" and that he had been looking to move for "about the last year and a half" to the San Francisco area, San Jose, Palo Alto or Sacramento. (*See* Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 16:20-17:3; 32:14-18.) When asked "Is there anything about San Jose that you like?" (*id*. at 16:6), Plaintiff testified "I'm actively looking for a place to relocate out that way." (*Id.* at 16:8-9.)

Then, in a deposition (also held on February 7, 2022) in another Northern District case entitled *Whitaker v. Peet's Coffee, Inc*., 3:21-CV-07055-WHA, Plaintiff testified that "the range of places that I have been looking to reside span from San Jose all the way to San Francisco." (*See* Sahelian Decl., ⁋ 5, Exh. D, Peet's Tr. at 60:6-8.) When questioned at this deposition as to whether prior testimony Plaintiff had given in a declaration stating "I'm also considering moving to Northern California, so I traveled all over Northern California to find a nice area to move to" (*id*. at 60:13-16), was still true, Plaintiff testified "yes." (*Id*. at 60:17-20.)

And yet, in both the February 7 Peet's Deposition and evidentiary hearing in this case, Plaintiff testified he has decided to "plant [his] feet in Sacramento," because prices are better in **Sacramento** as compared to the Bay Area. (Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 17:7-9.) In fact, in the Peet's Deposition, Plaintiff stated that he presently plans to move to **Sacramento** when his Los Angeles apartment lease ends in October 2022. (*See* Sahelian Decl., ⁋ 5, Exh. D, Peet's Tr. at 60:21-61:24.) Plaintiff further testified "yes" when asked: "At least as of today, haven't you already decided to pursue a plan to relocate to Sacramento, starting in October of 2022, as opposed to the Bay Area generally and as opposed to Burlingame specifically?" (*See id.* at 61:2-7.)

But then on March 3, 2022, in *Whitaker v. Tormrock, L.L.C.*, 3:21-cv-09550-JD (N.D.

Cal.), in response to a motion to dismiss for lack of standing, Plaintiff filed a first amended complaint newly alleging that he was "considering moving to the greater San Francisco Bay Area." (*See* RJN, Exh. 5, First Amended Complaint ("Tomrock FAC") at 2, ¶ 8; *compare to* RJN, Exh. 6, Initial Complaint in *Tormrock* ("Tormrock Complaint") filed on December 9, 2021.)

### C. Plaintiff Admits His Trips to the Bay Area Are Motivated by ADA Litigation.

In deposition testimony from November 11, 2021, Plaintiff testified that he comes to the Bay Area two or three times a month for three different reasons: (1) because he likes the area; (2) because he is "seriously thinking about relocating that way"; and (3) for his "advocacy." (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr. at 13:25-14:7.) When asked which of these three reasons "motivates" him the most to come to the Bay Area, Plaintiff testified under oath on <u>four</u> separate occasions that it was his "advocacy." (*See id.* at 14:8-12; 15:23-16:3; 24:2-4; and 27:18-21.) Plaintiff has testified that his goal in bringing ADA lawsuits is to make things more accessible for the disabled, and not the money that he receives from them. (*See* Sahelian Decl., ¶ 3, Exh. C, Pachanga Tr. at 84:12-14; 85:1-14; 165:23:166:1.) However, three months later, on February 7, 2022, at the evidentiary hearing held in this case, when questioned regarding his prior testimony that advocacy was his primary motivation for coming to the Bay Area two or three times a month, Plaintiff stated "Never said that, no, sir"; "That's not my primary reason, no"; "I've never said I have an advocacy program, and I never said that I travel up to the Bay to sue businesses. I've never relayed that to you, sir"; "But I don't go to these places to look for places to sue. That's not my motivation." (*See* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 33:10-23; 69:25-70:2; 70:8-9.) Instead on February 7, Plaintiff claimed his "primary reason" for coming to the Bay Area two to three times per month is because he is looking to "relocate to the area and canvassing the different areas to see where [he] want[s] to go." (*Id.* at 33:24-34:2.) Inexplicably, Plaintiff now claims that his "advocacy" is only a "very minimal" reason. (*Id.* at 34:3-6.)

### D. Plaintiff's Motivation in Filing ADA Lawsuits is Purely Financial.

Plaintiff testified that money is not a factor in filing ADA lawsuits. (*See* Sahelian Decl., ¶ 2, Exh. B, Goltz Tr. at 14:13-17.) Yet, on July 23, 2018, Plaintiff testified that his primary source of income is from social security equaling "a little over 900" but that it did not cover all of his

expenses and that he supplemented his income with freelance engineering and songwriting work which generated another $10,000 to $20,000. (*See* Sahelian Decl., ¶ 6, Exh. E, Depo. Testimony in *Whitaker v. Kashani, et al.*, 2:18-cv-00346-JFW-PLA (C.D. Cal.) ("Kashani Tr."), July 23, 2018 at 44:18-23; 44:24-25; 45:1-3; 45:10-25.) When Plaintiff was asked to estimate how much money he earned in 2017 by way of his ADA lawsuits, Plaintiff would not commit to an answer, although he stated it could be over $100,000 but less than $200,000. (*See id.* at 50:1-16.) At the February 7, 2022 evidentiary hearing in this matter, Plaintiff confirmed that he only works as a freelance engineer and songwriter which he performs approximately one to four hours per week. (*See* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 67:15-25.) Plaintiff readily admits that without the money made by way of his ADA lawsuits, he would not have the "resources" to travel to the Bay Area for his advocacy. (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr., at 14:22-15:5.)

### E.     Plaintiff Manufactures Article III Standing

Plaintiff's allegations in the instant case as to his intent to return and deterrence include:

- "Not only did Plaintiff personally encounter the unlawful barriers in May 2021, but he wanted to return and patronize the business again but was specifically deterred due to his actual personal knowledge of the barriers gleaned from his encounter with them." [Dkt. 1, ¶ 8.]

- "Plaintiff will return to the Restaurant to avail himself of its goods or services and to determine compliance with the disability access laws once it is represented to him that the Restaurant and its facilities are accessible." [*Id.*, ¶ 20.]

- "Plaintiff is currently deterred from doing so because of his knowledge of the existing barriers and his uncertainty about the existence of yet other barriers on the site." [*Id.*, ¶ 20.]

In fact, Plaintiff testified that it makes him feel good when he goes back to places and sees that barriers have been fixed because of his lawsuits. (*See* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 12:10-25.) And when asked "And that stems from you actually returning to the place right?", Plaintiff responded, "Yes, sir." (*Id.*)

### 1.     Plaintiff Never Revisited The Businesses He Sued.

Although Plaintiff testified that he has "revisited a lot of these businesses already" (*See*

-7-

1    Sahelian Decl., ⁋ 3, Exh. B, Goltz Tr. at 47:20-21), when asked for specific records or evidence of

2    these purported return visits, Plaintiff testified that he had failed to keep a single record for proof

3    (*id*. at 48:1-49:6) and he was unable to articulate how many visits he had made or even give a

4    range. (*id*. at 49:7-13): "I wouldn't know. I couldn't give you a number." (*Id*. at 12-13.) Indeed,

5    Plaintiff readily admits that he has no documentary evidence at all about any of these revisits to

6    the over 1,500 businesses he has sued. (*See* Sahelian Decl., ⁋ 3, Exh. C, Pachanga Tr. at 87:10-

7    88:9; Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 58:25-59:3 (no documentary evidence, receipts or

8    photographs); 51:8-10.) Plaintiff instead testified that he only keeps mental notes. (*See* Sahelian

9    Decl., ⁋ 3, Exh. C, Pachanga Tr. at 88:9; Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 46:6-7.)

10       At the evidentiary hearing in this case on February 7, Plaintiff testified that since he was

11   last questioned about whether he had returned to any of the businesses he had sued on December

12   2, 2021 in the *Pachanga* trial, he had now "jotted down some places that [he has] revisited" (*see*

13   Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 46:17) "in [his] phone" (*see id.* at 46:20) and out of the

14   over 1,500 cases he has filed and settled, he has jotted down "[m]aybe five or six" (*see id.* at 47:1)

15   and the remaining balance of over 1,900 he has committed to memory. (*See id.* at 47:5-9.)

16       And yet, the following are examples of Plaintiff's memory: (1) he cannot recall whether he

17   has been back to the Green Easy dispensary that he sued in *Whitaker v. MGR Properties, LLC*,

18   2:19-cv-05646-FMO-GJS (C.D. Cal. June 28, 2019) (*see* Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at

19   48:24-49:16); (2) he cannot recall whether he has been back to Pizza Italia that he sued in

20   *Whitaker v. Los Angeles United Investment Co, LLC, et al.*, 21STLC01615 in Los Angeles

21   Superior Court, on February 25, 2021 (*see id.* at 42:20-43:9); (3) he cannot recall the names of the

22   four other businesses that he visited and sued on the same day that he visited Pachanga Grill in

23   Manhattan Beach on January 29, 2020 (*see id.* at 51:8-10); (4) he cannot recall in what order he

24   visited each of the businesses that he sued in Manhattan Beach (*see* Sahelian Decl., ⁋ 3, Exh. C,

25   Pachanga Tr. at 159:4-15); (5) he cannot recall how he got to Manhattan Beach (*see id.* at 158:10-

26   27); (6) he cannot recall whether there were any other people with him when he went to

27   Manhattan Beach (*see id.* at 158:28-159:3); (7) he cannot recall where he ate the food that he

28   allegedly purchased in Manhattan Beach (*see id.* at 159:24-28); and (8) he testified that the

Rabano restaurant he sued was located in Redwood City, when, in fact, it is located in Hermosa Beach (*see* Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 41:8-18).

Further, although Plaintiff has testified that: (1) "When I bring a case, there's nothing that's ever settled without any remediation. There won't be a settlement without remediation" (*See* Sahelian Decl., ⁋ 3, Exh. B, Goltz Tr. at 31:4-9); (2) "the attorneys for Potter Handy do a beautiful job of making sure that things are remediated" (*id*. at 31:4-6); and (3) Potter Handy notifies him "when there's a settlement against a business" (*id*. at 33:14-15), Plaintiff has nonetheless failed to visit a majority, if not all, of the businesses he has sued and admits that he is incapable of revisiting them because he is unaware of who he has sued and which cases have settled. (*See id.* at 49:23-50:15; Sahelian Decl., ⁋ 3, Exh. C, Pachanga Tr. at 86:16-87:4; Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 58:12-19.)

When questioned as to why Plaintiff could not determine which of the businesses he had sued, Plaintiff testified that Potter Handy only notifies him of the business's legal or "LLC name" and not the retail name so he is unable to identify them. (*See* Sahelian Decl., ⁋ 3, Exh. B, Goltz Tr., at 33:15-18; Sahelian Decl., ⁋ 4, Exh. C, Pachanga Tr. at 86:16-87:4; Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 58:12-19 ("it's hard to distinctify[sic] corporation names from the actual businesses, which has prevented me from visiting a lot of these places that I've settled with").) Plaintiff admitted that he does not keep a log of the businesses he has sued and relies exclusively on what Potter Handy provides him. (Sahelian Decl., ⁋ 3, Exh. B, Goltz Tr., at 42:21-43:9.) In fact, on November 11, 2021, when questioned about the number of businesses Plaintiff had revisited, he was unable to identify the number and testified that he had no documentary evidence. (*See id.* at 49:7-13.) And then, at the evidentiary hearing held on February 7, Plaintiff altered his testimony stating instead, that he had visited "hundreds" but yet again, he had no documentary evidence. (*See* Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 58:1-19.)

### 2.   Plaintiff Does Not Have and Has Never Had Plans to Revisit.

When asked about his plans to revisit the 1,500+ businesses that he has sued, Plaintiff testified that he has no plans. (*See* Sahelian Decl., ⁋ 3, Exh. B, Goltz Tr., at 47:18-48:1.) Indeed, despite the fact that Plaintiff has regularly stated in declarations and testimony that he intends to

revisit the places he has sued, on November 11, 2021, when pressed as to his plans to revisit these

businesses, Plaintiff admitted that he does not "have a plan yet." (*See id.* at 49:20.)

> A. […] So first of all, the thing that I'll have to do is get a list of the
> businesses that settled and get a name other than the LLC name in
> order to come up with a plan. So I definitely want to come up with a
> solid plan so that I can visit each and every one of these places and
> make sure that things have been remediated and are up to par.
> Q. And have you ever asked for a list of all the businesses that
> you've sued?
> A. No, sir. (*Id.* at 49:5-15.)

At trial on December 2, 2021, in *Whitaker v. Pachanga*, Plaintiff testified that he had just

developed a plan to revisit all of the businesses he had sued and settled with by reaching out to

Potter Handy and requesting that they put together a list. (*See* Sahelian Decl., ¶ 4, Exh. C,

Pachanga Tr. at 166:10-27.) Yet, on February 7, 2022, Plaintiff testified in the instant case that he

was still working "on getting a list comprised." (*See* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 58:8-

19; 59:8-10.) Plaintiff testified further that he had requested this list from Potter Handy

approximately three months ago but had not yet received it. (*See id.* at 73:9-25.)

On December 2, 2021, Plaintiff was pressed about the details of his plan to revisit and

testified that it would probably take him two years to revisit each of them. (*See* Sahelian Decl., ¶

4, Exh. C, Pachanga Tr. at 167:1-12.) After being informed that his proposed plan would mean he

would have to visit four businesses per day for two years, Plaintiff stated: "Sir, I couldn't sit here

and give you the details right now because the plan is not put together. I gave you a speculation of

what I think I could do in two years, but once I have some time to sit down and really formulate a

plan, I could give you more in depth detail on the plan." (*Id.* at 167:21-26; *see also* 168:6-17 ("I

would have to put the plan together. I don't know if that's what I would do a day four a day. I

don't know, but, I mean, one thing I can tell you is I'm having the firm put the list together[…]").)

At the February 7 evidentiary hearing, Plaintiff was again asked about how he intends to

revisit all of the businesses he has sued and he stated, "One business at a time." (*See* Sahelian

Decl., ¶ 2, Exh. A, Evid. Tr. at 59:11-15; 64:12-14.) When asked how long it would take him,

particularly given his physical limitations, Plaintiff testified, "I don't know, sir. I have to get the

list together first." (*Id.* at 59:16-60:1.) When asked what it would take to accelerate his plans of

revisiting, Plaintiff stated: "There's no need to accelerate the plan because it's something that I'm

actively pursuing. I don't need a jump-start to do it." (*Id.* at 70:20-22.)

In response to Plaintiff's testimony about his failure to revisit the businesses he has sued and

his lack of a plan to revisit them, Potter Handy depicted Plaintiff's inconsistent statements as not

"lying" but rather, "forget[ful]" and due to a "change" in circumstance:

> Q.  Do you have a girlfriend?
> A. Yes, I do.
> Q. All right. Do you ever tell your girlfriend you're going to do
> something, you intend to do it, and then you forget or just fail to do
> it for some reason?
> A. Yes.
> […]
> BY MR. PRICE:
> […]
> BY MR. PRICE:
> Q. **When you say you're going to do something and then you
> forget to do it, are you lying**?
> A. No, sir.
> Q. Is there anything that happens in your cases, you know, you say
> you're going to intend to go back to something and then
> circumstances change after filing the litigation?
> […]
> THE WITNESS: Can you ask it again, sir?
> BY MR. PRICE:
> Q. **When you file your lawsuits, most of your lawsuits say you
> intend to return to the place that you had sued**.
> A. Mm-hmm.
> Q. Are there any circumstances that change after filing the lawsuit
> that would make you not return?
> A. Yes, sir.
> Q. What are among -- what sort of things might happen that would
> change that?
> A. Well, for one, you know, if I move from the area, the proximity
> that I am to the area, which still doesn't take away from my intent to
> return. Like I said, once I get this list comprised, I plan on going to
> every single place. I don't care if it's across the state or across the
> street. You know what I mean? So my intent to return has never
> wavered.
> […]
> BY MR. PRICE:
> Q. Is there any way that moving away from a business would make
> it harder for you to return to it?
> A. Yes, sir.
> Q. But if you have a list, would that change that circumstance?
> A. Absolutely.
> Q. And is that part of why you're making yourself – why you're
> having a list made?
> A. Yes. (*See* Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 82:6-84:11)

DEFENDANT'S SUPPLEMENTAL BRIEF

**F.** **Plaintiff's Perjurious Statements About His Intent To Return.**

In *Whitaker v. Kashani, et al.*, 2:18-cv-00346-JFW-PLA, Plaintiff testified as follows:

> Q. **Do you intend to go back?**
> A. If it's fixed, yeah, of course.
> Q. **How so?**
> A. How so what?
> Q. **In other words, under what circumstances do you intend to go back?**
> A. Well, let me rephrase that. I don't know if I intend to go back, but I would go back.

(*See* Sahelian Decl., ₱ 6, Exh. E, Kashani Tr. at 117:22-25 (emphasis added).) And yet, in the *Kashani* complaint, filed in the Central District on January 16, 2018, Plaintiff stated he "would like to return and patronize the Gas Station but will be deterred from visiting until the defendants cure the violations" and that he "will, nonetheless, return to assess ongoing compliance with the ADA and will return to patronize the Gas Station as a customer once the barriers are removed." (*See* RJN, Exh. 3, Complaint, Dkt. 1, ¶¶ 22, 26.) When questioned whether he had ever returned to the defendant's facility in that action since filing the case, Plaintiff admitted he had not explaining, "Well, my friend hasn't thrown another function, and I haven't caught the bus over there since then." (*See* Sahelian Decl., ₱ 2, Exh. A, Evid. Tr. at 40:5-7.)

In *Whitaker v. Pachanga Grill*, 20STLC03367, filed in Los Angeles Superior Court on April 15, 2020, Plaintiff admitted at trial that in the year and a half since he had filed his lawsuit against the restaurant, he still had not returned because it was too far away and he had simply not been back in the area. (*See* Sahelian Decl., ₱ 3, Exh. C, Pachanga Tr. at 163:14-164:4 ("but it's not like I'm going to go from 100 miles away to go get that burrito because it was that good.").)

In his deposition in *Whitaker v. Goltz*, 2:21-cv-00527-JAM-CKD, filed in the Eastern District on March 23, 2021, when questioned about whether Plaintiff had returned to a Jersey Mike's which was close to his prior residence in Downtown Los Angeles, Plaintiff testified he was unsure if he ever went back (28:23-29:1), that he would have to ask his lawyers (28:23-29:11; 29:23-30:6; 29:14-15), that he was sure he never went back there to dine (29:23-25; 37:20-21), that he has no concrete plans to return there (30:16-19), that he has taken no steps to evaluate whether remediations have been made (30:22-32:5), that he has no idea whether remediations

1    were made (31:10-18; 33:9-21); that the only steps he has taken to ensure remediation is the filing

2    of his complaint (31:7-9; 33:13-14); and that as of November 11, 2021, he had not "made a call to

3    the firm about that case in particular" (31:16-17). (*See* Sahelian Decl., ₱ 3, Exh. B, Goltz Tr.) In

4    fact, Plaintiff admitted that in the two years since he settled the Jersey Mike's matter, he had not

5    been back at all. (*See* Sahelian Decl., ₱ 4, Exh. C, Pachanga Tr. at 89:8-17.)

6    **III.    ANALYSIS**

7         **A.    Standard for Article III Standing**

8         A plaintiff suing in federal court has the burden of establishing standing. *See Lujan v.*

9    *Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Schmier v. U.S. Ct. App. for the Ninth Circuit*,

10   279 F.3d 817, 821 (9th Cir. 2001). The existence of standing "is an essential and unchanging part

11   of the case-or-controversy requirement of Article III" of the Constitution, from which federal

12   courts derive their subject matter jurisdiction. *Lujan*, 504 U.S. at 560. To possess standing

13   pursuant to Article III of the Constitution, "a plaintiff 'must show that (1) [he] has suffered an

14   'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

15   hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is

16   likely, as opposed to merely speculative, that the injury will be redressed by a favorable

17   decision.'" *The Cetacean Community v. Bush et al.*, 386 F.3d 1169, 1174 (9th Cir. 2004), quoting

18   *Friends of the Earth, Inc. v. Laidlaw Envtl. Sys. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

19              **1.    Legal Standing Under The ADA**

20        As to Article III's requirement that there be injury in fact, in the ADA context, a plaintiff

21   must establish through evidence that he encountered an accessibility barrier and either intends to

22   return or is deterred from returning to the facility. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631

23   F.3d 939, 950 (9th Cir. 2011) (en banc) and *Kirola v. City & Cty. of San Francisco*, 860 F.3d

24   1164, 1174 (9th Cir. 2017). In other words, a plaintiff must "demonstrate a sufficient likelihood

25   that she will again be wronged in a similar way . . . [t]hat is, she must establish a real and

26   immediate threat of repeated injury." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081

27   (9th Cir. 2004).

28        Further, because injunctive relief is the only remedy under Title III of the ADA, Plaintiff

-13-

Case No. 3:21-cv-03750-JSC
DEFENDANT'S SUPPLEMENTAL BRIEF

must show he or she faces a "real and immediate threat of repeated injury" to establish an injury in fact for purposes of standing. *Chapman*, 631 F.3d at 946 (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004)). The Ninth Circuit has held there are two ways an ADA plaintiff may establish standing to sue for injunctive relief: by either demonstrating "deterrence" or "injury-in-fact coupled with an intent to return to a noncompliant facility." *Chapman*, 631 F.3d at 944. Therefore, when seeking prospective injunctive relief, a plaintiff must show a likelihood of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Johnson v. JKLM Prop., L.L.C.*, 2020 U.S. Dist. LEXIS 167794, at *4 (N.D. Cal. Sept. 14, 2020) (plaintiff must allege facts that give rise to inference he will suffer future discrimination to establish standing under Title III). Merely professing an intent to return "some day" is not enough. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require [for Article III standing]."). "An ADA plaintiff must show at each stage of the proceedings either that he is deterred from returning to the facility or that he intends to return to the facility and is therefore likely to suffer repeated injury. He lacks standing if he is indifferent to returning to the store or if his alleged intent to return is not genuine." *Chapman,* 631 F.3d at 953.

The Ninth Circuit has stated that "case-by-case determinations about whether a particular plaintiff's injury is imminent is well within the competency of the district courts." *Civil Rights Education and Enforcement Center ("CREEC") v. Hospitality Properties Trust*, 867 F.3d 1093, 1100 (9th Cir. 2017). In *CREEC*, the Ninth Circuit cited with approval the Eleventh Circuit's ruling in *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–37 (11th Cir. 2013), and acknowledged that courts may assess "various factors in determining whether plaintiff suing under ADA Title III was likely to actually visit the supermarket, including prior visits, proximity of residence to store, plans for future visits, and status as an 'ADA tester who has filed many similar lawsuits.'" *CREEC*, 867 F.3d at 1100; *see also*, *Harris v. Del Taco, Inc.*, 396 F.Supp.2d 1107, 1113 (C.D. Cal. 2005) (citing four factor test to determine likelihood of future injury).

Importantly, *CREEC* did not do away with Article III standing requirements. *CREEC* still

Case No. 3:21-cv-03750-JSC
DEFENDANT'S SUPPLEMENTAL BRIEF

requires that even plaintiffs claiming "deterrence" (including a tester) must still show injury in fact

(encounter with a barrier or deterrence based on knowledge of a barrier) and a real and immediate

threat of future harm (to the plaintiff). *CREEC*, 867 F.3d at 1098-1099.  Importantly, the tester

plaintiff must still intend to visit the defendant's premises after remediation.  *Id.*

> The named Plaintiffs have alleged in the first amended complaint
> that they intend to visit the relevant hotels and have been deterred
> from doing so by the hotel's noncompliance with the ADA. They
> further allege that they will visit the hotels when the noncompliance
> is cured. Thus, the ADA violations have prevented them from
> staying at the hotels. **Without such averments, they would lack
> standing**.
>
> […]
>
> we conclude that the Named Plaintiffs have sufficiently alleged
> injury in fact.  *Chapman*, 631 F.3d at 953. Their harm is "concrete
> and particularized," and their intent to visit the hotels once they
> provide equivalent shuttle service for the disabled renders their harm
> "actual or imminent, not conjectural or hypothetical." *Lujan,* 504
> U.S. at 560. *CREEC*. 867 F.3d at 1099.

Of significance is the Ninth Circuit's reliance in *CREEC* on the Eleventh Circuit's holding

in *Houston v. Marod Supermarkets, supra,* because in *Houston*, the court held that although a

tester's motive does not matter "[b]ecause Plaintiff Houston seeks injunctive relief, he also must

show a real and immediate threat of future injury… As noted earlier, Plaintiff Houston's 'standing

to seek the injunction requested depend[s] on whether he [i]s likely to suffer future injury.'"

*Houston*, 733 F.3d at 1334-1335 (citing *Lyons*, 461 U.S. at 105, 103 S. Ct. at 1667). The court

went on to state that Houston "must show a sufficient likelihood that he will be affected by the

allegedly unlawful conduct in the future." *Houston*, 733 F.3d at 1328-1329 (citing *Wooden*, 247

F.3d at 1283). That requires "a real and immediate—as opposed to a merely conjectural or

hypothetical—threat of future injury." *Houston*, 733 F.3d at 1329 (citing *Shotz*, 256 F.3d at 1082;

*Wooden*, 247 F.3d at 1283). In its analysis, the court evaluated the proximity of Houston's

residence to the business, his past patronage of the business, the "definiteness" of his plans to

return to the business, and the frequency of his travel near the business. *Houston*, 733 F.3d at

1327-1328.

Subsequent to CREEC, several courts have confirmed that "testers" must still prove the

important Article III requirements for standing to obtain prospective injunctive relief in ADA cases. *See* e.g., *Johnson v. Alhambra & O Assocs.*, 2019 U.S. Dist. LEXIS 105388 (E.D. Cal. June 24, 2019) at **7-9 ("The Court agrees with Defendants that Plaintiff's tester status, alone, is not enough to confer standing [...] an ADA plaintiff's claimed deterrence must be genuine"); *Langer v. YM Holdings, LLC*, 2020 U.S. Dist. LEXIS 114073, **9-10 (S.D. Cal. June 29, 2020) ("even if Plaintiff is alleging tester standing, he must still show an 'intent to visit [Color & Signs] once they provide [accessible parking and an accessible pathway] for the disabled . . . .' *see CREEC,* 867 F.3d at 1099. Indeed, the Ninth Circuit implied that even when tester standing is alleged, district courts must make a 'case-by-case' determination of whether a plaintiff's injury is imminent, including 'whether a plaintiff suing under the ADA . . . was likely to actually visit' the complained of business."); *Whitaker v. Prime Oil Mgmt.*, 2021 U.S. Dist. LEXIS 192385 , **5-7 (C.D. Cal. April 8, 2021) ("In recognizing the deterrent effect and tester standing doctrines, 'the Ninth Circuit did not relax the requirement that the Plaintiff demonstrate real and immediate threat of repeated injury by showing a legitimate intent to visit again the public accommodation in question.') (internal citations omitted); *Lindsay v. Mulne*, 2019 U.S. Dist. LEXIS 239354, *11 (C.D. Cal. Nov. 21, 2019) ("an ADA plaintiff's intent to return must be 'genuine'"); *Gastelum v. Hees II*, 2021 U.S. Dist. LEXIS 208436, *7-*8 (S.D. Cal. October 28, 2021) ("An ADA plaintiff therefore 'lacks standing if he is indifferent to returning to the store or if his alleged intent to return is not genuine.'") Here, Plaintiff has failed to establish that he has (or ever had) Article III standing to pursue injunctive relief because he fails to show an injury-in-fact and an imminent threat of future harm. Rather, Plaintiff has admitted that he has no intent to return to a single business he sues.

     **B.**     **Plaintiff Fails to Show an Injury-In-Fact or Imminent Threat of Future Harm.**

        **1.**     **Plaintiff Has Not Gone Back To Any of the Businesses He Has Sued.**

Plaintiff repeatedly alleges in his complaints that he visits businesses for the purpose of assessing their compliance. (*See* e.g., Dkt. No. 1, Complaint, ¶ 8) ("Plaintiff went to the Restaurant in May 2021 with the intention to avail himself of its goods or services motivated in part to determine if the defendants comply with the disability access laws). Indeed, at his November 11, 2021 deposition in *Whitaker v. Goltz Corp.*, Plaintiff testified that he comes to the Bay Area about

1    two to three times a month and that his primary reason for these visits is for his ADA advocacy.

2    (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr. at 14:8-12; 15:23-16:3; 24:2-4; and 27:18-21.) Indeed,

3    in Plaintiff's complaint in the instant matter he stated he "will return to the Restaurant to avail

4    himself of its goods or services and to determine compliance with the disability access laws once

5    it is represented to him that the Restaurant and its facilities are accessible." (*See e.g*., Dkt. No. 1,

6    Complaint, ¶ 20.)

7         Given the allegations Plaintiff makes in his complaints regarding his intent to return,

8    coupled with his testimony in regards to his motivation of "advocacy" in visiting the 589

9    businesses in the Northern District, it defies logic that Plaintiff would readily admit that he has no

10   plans to return to any of the businesses that he has sued. (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz

11   Tr., at 47:18-48:1; *See* Sahelian Decl., ¶ 4, Exh. C, Pachanga Tr. at 167:21-26; *see also* 168:6-17;

12   *See* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 59:11-60:1; 64:12-14.) Surely, if "advocacy" was in

13   fact Plaintiff's primary motivation, he would make sure the remediations sought by way of his

14   complaints were actually made or, otherwise, he is not really an advocate at all. And yet, Plaintiff

15   cannot even identify which businesses he has revisited, if any, and he has no documentary

16   evidence whatsoever either. (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr. at 47:20-21; 48:1-49:13;

17   Sahelian Decl., ¶ 4, Exh. C, Pachanga Tr. at 87:10-88:9; Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at

18   58:25-59:3; 51:8-10.)

19        Indeed, Plaintiff will have the Court believe that without any documentary evidence at all

20   to support his purported return visits, that he has in fact been back to "hundreds" of them (*see*

21   Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 58:1-19), but that the only businesses he has so far jotted

22   down from memory are "[m]aybe five or six" (*see id.* at 47:1) and the remaining balance of over

23   1,900 he has committed to memory (*see id.* at 47:5-9.)

24        It is very likely that in opposing Defendant's brief here, Plaintiff will miraculously produce

25   a list of businesses that he has revisited in a last ditch effort to save his "standing" – a list which he

26   has admitted over and over again under penalty of perjury does not exist. (*See* Sahelian Decl., ¶ 3,

27   Exh. B, Goltz Tr. at 48:1-49:6; *See* Sahelian Decl., ¶ 4, Exh. C, Pachanga Tr. at 87:10-88:9;

28   Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 58:25-59:3; 51:8-10.) And yet, if such a list appears,

Plaintiff has already readily admitted he has not been back to most of the 1,733 businesses that he has sued and has not, to date, developed a plan for revisiting them. (Exh. C, Pachanga Tr. at 167:21-26 ("Sir, I couldn't sit here and give you the details right now because the plan is not put together. I gave you a speculation of what I think I could do in two years, but once I have some time to sit down and really formulate a plan, I could give you more in depth detail on the plan."); *see also* 168:6-17 ("I would have to put the plan together. I don't know if that's what I would do a day four a day. I don't know, but, I mean, one thing I can tell you is I'm having the firm put the list together[…]").)

Plaintiff's admission about his lack of *any* plan to revisit the businesses he has sued is fatal to his standing to pursue injunctive relief because it proves that he has no concrete plan to revisit them, including Defendant Irish House here. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require [for Article III standing].").

**2.  Plaintiff and His Attorneys Concede He Never Had An Intent Or Plan to Return**

In an effort to continue litigating cases in the Northern District, Plaintiff has submitted numerous sworn declarations in opposition to motions to dismiss in which he testifies for example "If the restaurant is accessible to me, I will certainly visit it again." (*See e.g.* RJN, Exh. 2 at ¶ 3.) Similarly, in his numerous complaints, Plaintiff alleges that he "will return to the Restaurant to avail himself of its goods or services and to determine compliance with the disability access laws once it is represented to him that the Restaurant and its facilities are accessible." [Dkt., No. 1, Complaint ¶ 20.] At the February 7 evidentiary hearing, Plaintiff's attorney, Dennis Price, attempted to rehabilitate Plaintiff's testimony regarding his intent to revisit by stating: "When you file your lawsuits, most of your lawsuits say you intend to return to the place that you had sued." (*See* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 83:7-10.)

However, Plaintiff's self-serving statements as to his supposed standing are false. In fact, Plaintiff's statements as to his standing which are either made under oath or provided to the Court

by his attorneys pursuant to Rule 11 are demonstrably false. For example, at least as of November 11, 2021 (if not before), at Plaintiff's deposition in *Whitaker v. Goltz*, Potter Handy demonstrably knew that Plaintiff did not possess the requisite standing to pursue injunctive relief under the ADA when Plaintiff stated that he had no plans to revisit any of the businesses that he had sued and that he was not even aware of which businesses he had sued. (*See* Sahelian Decl., ℙ 3, Exh. B, Goltz Tr., at 47:18-48:1; 49:5-15 *See* Sahelian Decl., ℙ 4, Exh. C, Pachanga Tr. at 167:21-26; *see also* 168:6-17; *See* Sahelian Decl., ℙ 2, Exh. A, Evid. Tr. at 58:8-19; 59:8-60:1; 64:12-14; 73:9-25; 82:6-84:11.) However, Potter Handy continued filing ADA lawsuits on Plaintiff's behalf — approximately 134 filed in the Northern District since November 11, 2021 to be exact (*see* RJN, Ex. 8) — and continued to assert the exact same allegations in his complaints as to his supposed standing that: "Plaintiff will return to the Restaurant to avail himself of its goods or services and to determine compliance with the disability access laws once it is represented to him that the Restaurant and its facilities are accessible." (*See e.g.,* RJN, Exh. 5, Tomrock FAC at 4, ℙ 26.)

Additionally, by at least November 11, 2021 (if not before), Potter Handy knew that declarations being submitting to courts on Plaintiff's behalf in opposing motions to dismiss on the issue of standing, were false. Potter Handy was further aware that Plaintiff's statements had served to misled courts resulting in defendants losing motions to dismiss that they would otherwise have won but not for Plaintiff's perjurious declarations. And yet, Potter Handy continued the litigation.

One such example is *Whitaker v. Marso LLC*, Case No. 4:21-cv-03711-PJH, filed on May 18, 2021. In *Marso*, Plaintiff submitted a declaration in opposing defendant's motion to dismiss for standing stating: "I am also considering moving to Northern California, so I travel all over Northern California to find a nice area to move to. I have visited the Redwood City area at least three times recently, and I plan on returning in the near future to look for possible places to move to. If the restaurant is accessible to me, I will certainly visit it again.." (*See* RJN, Ex. 9, Whitaker Decl. in *Marso*, Dkt. No. 15-1, ¶ 3.) The *Marso* court relied on Plaintiff's declaration in denying defendant's motion to dismiss finding that Plaintiff had sufficiently established an "intent to return" to the restaurant stating: "[Plaintiff] describes in his declaration that he frequently travels to the Bay Area because he loves the area and is considering moving to Northern California . . .

[h]e describes his regular travel by various modes of transportation despite not driving and using a wheelchair for mobility . . . [and] [t]hus, despite the significant distance between Whitaker's home and defendant's restaurant, he has alleged his intent to return to the Bay Area." *Whitaker v. Marso LLC*, 2021 U.S. Dist. LEXIS 178986, *6 (N.D. Cal. Sept. 20, 2021). As a result of this finding, this case eventually settled on September 28, 2021. (*See* RJN, Ex. 10, Dkt. 23.)

Given Plaintiff's lack of standing and Potter Handy's knowledge of this fact, it is not surprising that at the evidentiary hearing held in this matter on February 7, Plaintiff's attorney, Dennis Price, attempted to distract from Plaintiff's and Potter Handy's wrongdoing by having what can best be described as a truly bizarre exchange wherein Attorney Price tried to explain Plaintiff's inconsistencies as not "lying" but rather, "forget[ting]." (*See* Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 82:6-84:11.) But again, Plaintiff and Potter Handy knew, at least as of November 11, 2021 (if not before), that Plaintiff's ADA claims were a sham because Plaintiff lacked the requisite Article III standing to pursue injunctive relief but yet, they persisted.

**3.    Plaintiff's Intent to Return Has Been Determined To Be Not Credible.**

As discussed previously, Plaintiff has filed at least 589 lawsuits in the Northern District since March of 2020, and at least 1,733 in Federal Courts across the State of California since 2014. (*See* RJN, Exhs, 1, 8.) Several of these cases have gone to trial or summary judgment where courts have been able to evaluate and assess the credibility of Plaintiff's testimony and make findings of fact. These courts have overwhelmingly found that Plaintiff's self-serving statements as to his "intent to return" — an essential factor in his ability to file Federal ADA lawsuits — is lacking in credibility. These prior credibility determinations on the exact same issue presented here are extremely relevant to show that Potter Handy has a pattern and practice of manufacturing standing and for the sole purpose of funding its enterprise.

Of significance in showing the frivolous nature of Potter Handy's insistence in this case of Whitaker's standing is the case of *Garcia v. Alcocer*, et al., Case No. 2:20-cv-08419-VAP-(JEMx) filed on September 15, 2020 in the Central District. On November 16, 2022, that case went to trial and involved another of Potter Handy's ADA plaintiffs, Orlando Garcia.  On December 1, 2021, the *Garcia* court issued its Findings of Fact concluding that "Garcia's demeanor and memory

1   during his testimony undermines the credibility of his intent to return." (*See* RJN, Exh. 11, at 7.)

2   And, in a subsequent order on defendants' motion for fees, the *Garcia* court found that "despite

3   having alleged tester standing and deterrence as a result of the non-ADA-compliant counter he

4   experienced at Defendants' check-cashing location, Plaintiff did not prove at trial that he had a

5   credible, genuine intent to return to the check-cashing location." (*See* RJN, Exh. 12, Order

6   Granting Mot. for Attys' Fees, Jan. 19, 2022 at 2.) Of crucial importance to the case here, in

7   granting defendants $36,775 in fees, the *Garcia* court stated the following:

8           Plaintiff's litigation history shows he was aware of the standing
            requirements for ADA claims and on multiple occasions has failed
9           to satisfy those requirements. This conduct, taken together with his
            lack of credibility in this case, strongly weigh in favor of finding the
10          present action both frivolous and unreasonable. [...] Plaintiff did not
            have a reasonable basis to allege an injury-in-fact that would support
11          Article III standing. Plaintiff knew or should have known that he
            lacked standing in this case. This action raised no standing issues
12          that had not already been resolved unambiguously by prior decisions
            within the Ninth Circuit and the Central District of California. (*Id.* at
13          8-9, 16.)

14          Although the above case involved another one of Potter Handy's plaintiffs, the court's

15  holding is significant here. **First**, all of Potter Handy's plaintiffs file the same boilerplate lawsuits

16  making identical boilerplate allegations as to standing. **Second**, as the evidence here has

17  established, Plaintiff Whitaker is also not credible as he has offered false and inconsistent

18  testimony in an effort to manufacturer standing. **Third**, Potter Handy has been aware at least as of

19  November 11, 2021 (if not earlier) that Plaintiff Whitaker had no intention or plan to revisit the

20  businesses that he had sued. **Fourth**, Dennis Price's examination of Plaintiff Whitaker wherein he

21  attempts to explain away Plaintiff's inconsistencies as not "lying" but rather "forget[ting]"

22  evidences Potter Handy's complicity in (and direction of) Plaintiff's falsities being offered to this

23  Court. Based on these facts, there is no doubt that Potter Handy knows that "there is no reasonable

24  basis to allege injury-in-fact that would support Article III standing" for Plaintiff Whitaker in this

25  case (and in all the other cases prosecuting on his behalf).

26          And if the argument above is not already determinative of Potter Handy's fraud, the

27  following additional cases evidence that Potter Handy has been aware of Plaintiff Whitaker's lack

28  of credibility and standing from other matters: ***Whitaker v. BPP East Union LLC***, 2:20-cv-06818-

MWF-E (C.D. Cal. Dec. 11, 2020) (court found Plaintiff's "alleged intent to return to the restaurant here does not appear genuine, given that he has made the same assertion with respect to the 990 other business he has sued" and found his "intent to return is hypothetical at best, which is insufficient to establish standing") (*see* RJN, Exh. 13 at 6); ***Whitaker v. PQ Americana, Inc.***, 2020 U.S. Dist. LEXIS 71958, *6-8 (C.D. Cal. Mar. 20, 2020) (court held Plaintiff's did not have intent to return because "Plaintiff has filed hundreds of disability discrimination lawsuits and, consistent with the Court's 'judicial experience and common sense,' could not possibly return to each of the places he has sued."); ***Whitaker v. Kajima Dev. Corp.***, 20STLC02281 (L.A. Super. Ct. Oct. 8, 2021) (finding after bench trial that Plaintiff (i) "asserted in his federal complaint and in his verified state complaint that he could return to [the restaurant] for [food], yet he never returned," (ii) "it appears that there is no reason Mr. Whitaker could not have availed himself of the services at [restaurant] if he wanted to," and (iii) he "had not returned to any of the other 9 [restaurant] establishments he visited [the same day he visited the restaurant].") (*see* RJN, Exh. 14, Ruling on Submitted Matter ("Kajima Ruling"), October 8, 2021); ***Whitaker V. Dollar Hits Temple Inc.***, 2021 U.S. Dist. Lexis 66854 (C.D. Cal. April 6, 2021) (court concluded, after conducting a bench trial, that Whitaker's testimony regarding his intent to return was not credible); and ***Whitaker v. Pachanga***, 20STLC03367 (L.A. Super. Ct. April 15, 2020) (following bench trial, court held Plaintiff's testimony not credible as to his "his claim that he wanted to return to Pachanga to purchase another burrito, but was dissuaded from doing so") (*see* RJN, Exh. 4, *Whitaker v. Pachanga Mexican Grill*, Case No. 20STLC03367, Ruling on Submitted Matter, December 6, 2021.)

#### 4. Plaintiff Now Intends to Move to Sacramento.

In his sworn testimony at the evidentiary hearing on February 7, Plaintiff changed his testimony entirely and now claims that he actually intends to move to Sacramento in October 2022. (*See* Sahelian Decl., ⁋ 2, Exh. A, Evid. Tr. at 17:7-9 (Plaintiff testified that he has decided to "plant [his] feet in Sacramento,"); ⁋ 5, Exh. D, Peet's Tr. at 60:21-61:24 (Plaintiff testified that he presently plans to move to Sacramento when his Los Angeles apartment lease ends in October 2022).) The fact that Plaintiff now plans to move to Sacramento casts serious doubt on his stated

reasons for having visited the Irish House in the first place. It also undermines Plaintiff's testimony that he intends to go back since he has testified that he only keeps coming to the Bay Area to look for areas to move to and he has now decided that he is moving to Sacramento.

### 5.     Plaintiff's Perjurious Testimony Destroys His Credibility.

Below is a list of Plaintiff's inconsistent and false statements which serve to fully undermine  his credibility.

- On February 7, Plaintiff testifies, that he has decided to "plant [his] feet in Sacramento," after determining that prices are better in Sacramento as compared to the Bay Area generally. (Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 17:7-9.) ***Compare to:*** Also on February 7, Plaintiff testifies, "the range of places that I have been looking to reside span from San Jose all the way to San Francisco." (*Id.*, ¶ 5, Exh. D, Peet's Tr. at 60:6-8.)

- On February 7, Plaintiff testified that he presently plans to move to Sacramento when his Los Angeles apartment lease ends in October 2022. (*See id.* at 60:21-61:24) ***Compare to:*** Also on February 7, Plaintiff stated "yes" when asked whether prior declaration was still true that stated, "I'm also considering moving to Northern California, so I traveled all over Northern California to find a nice area to move to" (*Id.* at 60:13-20.)

- On February 7, Plaintiff stated "yes" when asked, "At least as of today, haven't you already decided to pursue a plan to relocate to Sacramento, starting in October of 2022, as opposed to the Bay Area generally and as opposed to Burlingame specifically?" (*Id.* at 61:2-7) ***Compare to:*** On March 3, 2022 in *Whitaker v. Tormrock, LLC*, Case No. 3:21-cv-09550-JD (N.D. Cal.), in response to a motion to dismiss for lack of standing, Plaintiff files a first amended complaint stating "Plaintiff is considering moving to the greater San Francisco Bay Area" (RJN, Exh. 5, Tomrock FAC at 2, ¶ 8.)

- On November 11, 2021, Plaintiff testified his primary motivation for coming to the Bay Area is because of his "advocacy." (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr. at 13:25-14:12; 15:23-16:3; 24:2-4; 27:18-21.) ***Compare to:*** On February 7, 2022, when asked whether his primary motivation for coming to the Bay Area was for ADA advocacy, Plaintiff states, "Never said that, no, sir"; "That's not my primary reason, no"; "I've never said I have an advocacy program, and I never said that I travel up to the Bay to sue businesses. I've never relayed that to you, sir"; "But I don't go to these places to look for places to sue. That's not my motivation." (*See* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 33:10-23; 69:25-70:2; 70:8-9.)

- On November 11, 2021, Plaintiff was unable to identify the number of businesses revisited and testified he did not have any evidence of revisits (*see* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr. at 49:7-13) ***Compare to:*** Plaintiff changed his testimony testifying that he had visited "hundreds." (*see* Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 58:1-19.)

- In his Complaint, Plaintiff alleges "he wanted to return and patronize the business again but was specifically deterred […]." [Dkt. No. 1, Complaint, ¶ 8] Plaintiff also alleged he "will return to the Restaurant to avail himself of its goods or services and to determine compliance with the disability access laws […]." [*Id.*, ¶ 20.]

Case No. 3:21-cv-03750-JSC

DEFENDANT'S SUPPLEMENTAL BRIEF

***Compare to:*** On November 11, 2021 Plaintiff testified that he did not have any plans to return to businesses he has sued. (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr., at 47:18-48:1)

- At trial on December 2, 2021, in *Whitaker v. Pachanga*, Plaintiff testified he had started working on a plan to revisit the businesses sued by reaching out to his attorneys and requesting they put together a list of all businesses. *See* Sahelian Decl., ¶ 3, Exh. C, Pachanga Tr. at 166:10-27. ***Compare to:*** On February 7, 2022, Plaintiff testified at the evidentiary hearing in this case that he was still working "on getting a list comprised." (Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 58:8-19; 59:8-10.)

- On December 2, 2021, Plaintiff testified that it would probably take him two years to revisit each of the businesses sued. *See* Sahelian Decl., ¶ 4, Exh. C, Pachanga Tr. at 167:1-12. ***Compare to:*** At the February 7 evidentiary hearing, when asked how long it would take him to revisit the businesses sued, Plaintiff testified, "I don't know, sir. I have to get the list together first." (Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 59:11-60:1; 64:12-14.)

- Plaintiff testified that money is not a factor in filing ADA cases. (*See* Sahelian Decl., ¶ 3, Exh. B, Goltz Tr. at 14:13-17.) ***Compare to:*** Plaintiff admits without the money from ADA lawsuits, he would not have the "resources" to travel to the Bay Area for his advocacy. (*See id.* 14:22-15:5.)

- On November 11, 2021, Plaintiff testified that: (1) "When I bring a case, there's nothing that's ever settled without any remediation. There won't be a settlement without remediation" (*See id.* at 31:4-9); (2) "the attorneys for Potter Handy do a beautiful job of making sure that things are remediated" (*id.* at 31:4-6) ***Compare to:*** Plaintiff's testimony at the evidentiary hearing on February 7: "a lot of these -- a lot of businesses don't make the changes. Like, I'm seeing a lot of places in Los Angeles that I've been to that I've brought litigation against and there's still no accessibility." (Sahelian Decl., ¶ 2, Exh. A, Evid. Tr. at 81:19-25.)

- In *Whitaker v. Kashani, et al.*, 2:18-cv-00346-JFW-PLA, when asked whether he intends to go back to the defendant's business, Plaintiff testified, "I don't know if I intend to go back, but I would go back." (*See* Sahelian Decl., ¶ 6, Exh. E, Kashani Tr. at 117:22-25 ***Compare to:*** In the *Kashani* complaint, Plaintiff stated he "will, nonetheless, return to assess ongoing compliance with the ADA and will return to patronize the Gas Station as a customer once the barriers are removed." (*See* RJN, Exh. 3 , Complaint, Dkt. 1, ¶¶ 22, 26.)

Because of his lack of credibility, all self-serving statements given by Plaintiff here as to his standing should be disregarded.

### 6.    Plaintiff Is Neither a Bona Fide Customer Nor A Tester.

Plaintiff is neither a bona fide patron nor a tester. Plaintiff has testified that he receives a social security income of $900, that this income is not sufficient to pay for his expenses, and that he also does some freelance work as an audio engineer but that he only does this one to four hours per week. Plaintiff has admitted that were it not for his ADA lawsuits and the money that it generates, he would not have the "resources" to travel to the Bay Area for his advocacy. Plaintiff

-24-

Case No. 3:21-cv-03750-JSC
DEFENDANT'S SUPPLEMENTAL BRIEF

1  has testified that he pursues ADA litigation because of his interest in advocacy and not because of

2  the money it generates. And yet, Plaintiff's own testimony provides a glimpse into his job as a

3  Potter Handy plaintiff. For example, on August 25, 2021, Plaintiff testified that he flew to the San

4  Jose airport at approximately 10 a.m. (*see* Sahelian Decl., ¶ 5, Exh. D, Peet's Tr. at 18:15; 17:1-6;

5  22:6-11; 26:15-17.), managed to go to 14 businesses that he later filed suit against, (*see* RJN, Exh.

6  7, Peet's Supp. Record at pp. 3-6.), and then just after two to three hours, left the area to go back

7  to the airport to catch a 7 or 8 p.m. flight back to Los Angeles. (*See* Sahelian Decl., ¶ 5, Exh. D,

8  Peet's Tr. at 22:9-11.)

9        Based on Plaintiff's inconsistent testimony: first, that he goes to the Bay Area primarily for

10  his advocacy, then later that his visits are primarily for moving to the area, and then later that he is

11  actually now looking into moving to Sacramento, show that Plaintiff's ever-changing statements

12  cannot be relied upon. The evidence, and common sense, show Plaintiff comes to the Bay Area to

13  make a living filing ADA lawsuits and that he never possesses standing to pursue these cases

14  because he never formulates an intent to revisit the businesses at the time of initiating his lawsuits,

15  (nor throughout) and he is neither a bona fide customer, nor an ADA tester.

16  **IV.**   **CONCLUSION**

17        For all the foregoing reasons, the Court should make a factual finding that Plaintiff did not

18  have standing at the time he filed this action, nor throughout the entirety of this litigation.

19                        Respectfully Submitted,

20  Dated: March 14, 2022

21                    SAHELIAN LAW OFFICES

22

23                    By   */s/ Ara Sahelian*

24                        Ara Sahelian
                          Attorneys for Defendant

25                        Slainte Bars, LLC

26

27

28

Case No. 3:21-cv-03750-JSC

DEFENDANT'S SUPPLEMENTAL BRIEF